UNITED STATES BANKRUPTCY COURT                    **NOT FOR PUBLICATION**

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
|  |  | Chapter 11 |
| In re: | : |  |
|  |  | Case Nos. |
| METROMEDIA FIBER NETWORK, INC., | : | 02 B 22736 (ASH) thru 02 B 22742 (ASH) |
| *et al.,* |  | 02 B 22744 (ASH) thru 02 B 22746 (ASH) |
|  | : | 02 B 22749 (ASH) |
| Debtors. |  | 02 B 22751 (ASH) thru 02 B 22754 (ASH) |
|  | : | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| ABOVENET, INC. (f/k/a Metromedia Fiber | : |  |
| Network, Inc.) and ABOVENET |  |  |
| COMMUNICATIONS, INC. ((f/k/a | : |  |
| Metromedia Fiber Network Services, Inc.), |  |  |
|  | : |  |
| Plaintiffs, |  |  |
| -against- | : | Adv. Proc. No. 04-08564A |
|  |  |  |
| LUCENT TECHNOLOGIES, INC., | : |  |
|  |  |  |
| Defendant. | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**A P P E A R A N C E S :**

**KRONISH LIEB WEINER & HELLMAN LLP**
**Attorneys for Plaintiffs/Debtors**
**By: Ronald R. Sussman, Esq.**
      **Richard S. Kanowitz, Esq.**
      **Eric Haber, Esq.**
      **Matthew E. Beck, Esq.**
**1114 Avenue of the Americas**
**New York, NY 10036**

**McCARTER & ENGLISH, LLP**
**Attorneys for Defendant**
**By: Joseph Lubertazzi, Jr., Esq.**
      **Eduardo Glas, Esq.**
**245 Park Avenue, 27th Floor**
**New York, NY 10022**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

## OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs, reorganized debtors Abovenet, Inc. (f/k/a Metromedia Fiber Network, Inc.)

and Abovenet Communications, Inc. (f/k/a Metromedia Fiber Network Services, Inc. (collectively,

where appropriate with other debtor entities, "MFN" or "Debtors"), brought this adversary proceeding

against defendant Lucent Technologies, Inc. ("Lucent") to recover a single prepetition payment made

by the Debtors to Lucent by wire transfer in the amount of $782,712 (the "Transfer") as a preference

under Section 547 and as a fraudulent conveyance under Section 548 of the Bankruptcy Code.  The

fraudulent conveyance claim under Section 548 has been voluntarily dismissed.  The parties have made

cross-motions for summary judgment on the preference claim.

I conclude that there are no triable issues of fact and that Lucent is entitled as a matter

of law to judgment dismissing the preference claim under the "ordinary course of business" exception in

Section 547(c)(2).

## Jurisdiction

This Court has jurisdiction over this core proceeding under 28 U.S.C. §§ 1334(a) and

157(a) and (b) and the standing order of referral of cases to bankruptcy judges dated July 10, 1984

signed by Acting Chief Judge Robert J. Ward.

## Background

MFN (pre-petition) and Debtors (post-petition) provide fiber optic infrastructure, high-

bandwidth internet connectivity and managed internet infrastructure services for their communications-

intensive customers. Lucent is a manufacturer and provider of telephone communications products and equipment. Prior to the petition Lucent sold to MFN fiber optic cable and other telecommunications equipment pursuant to an August 1997 Furnished Only Product Purchase Agreement and subsequent amendments (the "FOPPA"). In late 2000 or early 2001 MFN fell behind in payment obligations to Lucent for products sold under the FOPPA, and Lucent became one of MFN's largest creditors.

By mid-2001 MFN faced a severe liquidity crisis. To remain solvent MFN sought additional financing from Citibank and other lenders (the "Lenders"). The Lenders agreed to provide $380 million in new long-term debt to MFN but required that MFN restructure a large percentage of MFN's outstanding vendor payables. Ultimately, over 300 of MFN's vendors agreed to restructure over $500 million in debt that MFN owed (the "MFN Restructuring"). The MFN Restructuring was completed on October 1, 2002.

One of the vendors which participated in the MFN Restructuring was Lucent (the "Lucent Debt Rescheduling"). In accordance with an agreement (the "Lucent Agreement"), the amount of debt that was rescheduled was $36,067,378 evidenced by a note (the "Lucent Note"), consisting of $27,357,808.10 for products and services that Lucent had previously provided to MFN and $8,709,570 for additional products which were located at the Hilversum Warehouse in Europe. The Lucent Note provided for payment of equal monthly installments in the amount of $1,639,467.01 for twenty-two months. On November 1 and November 30, 2001 the Debtors paid the first and second installments each in this amount.

The Lucent Note contained a prepayment provision authorizing MFN, at MFN's option, to prepay up to half the Lucent Note with registered, fully transferable stock. On December 21, 2001 the Debtors exercised their option under the terms of the Lucent Note and prepaid

$16,895,373 of the rescheduled debt with the issuance of stock.  This prepayment reduced the future

monthly payments of principal and interest from $1,639,467 to $807,393, but the larger amount was

inadvertently paid by MFN to Lucent for the January 1, 2002 payment, resulting in an overpayment of

$832,074.  After using this overpayment to satisfy the February 2002 monthly payment, reducing the

remaining overpayment amount to $24,681, MFN made the net payment due for March by wire

transfer in the amount of $782,712 (the "Transfer").

The Transfer was within the three-month preference period, and it is this Transfer which

MFN seeks to recover in this adversary proceeding.


## Points of Controversy

There is no dispute that the Transfer was (1) to or for the benefit of creditor Lucent, (2)

for or on account of an antecedent debt owed by MFN before such transfer was made, (3) made while

MFN was insolvent, (4) made within ninety days before the date of the filing of the petition and (5)

enabled Lucent to receive more than it would have received if the Transfer had not been made and the

case were a case under Chapter 7, thereby fulfilling the requirements of Section 547(b)(1) through (5).

Lucent has asserted the so-called "ordinary course of business" defense under

Section 547(c)(2)(A), (B) and (C).   The relevant portion of the statute reads as follows:

(c)    The trustee may not avoid under this section a transfer —

(2)    to the extent that such transfer was —

(A)    in payment of a debt incurred by the debtor in the ordinary
course of business or financial affairs of the debtor and the transferee;

(B)    made in the ordinary course of business or financial affairs of
the debtor and the transferee; and

(C)      made according to ordinary business terms;

The parties agree that the Transfer was "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee," thereby satisfying subpart (A).

Controversy arises under subparts (B) and (C) of Section 547(c)(2).  The Debtors contend that seven elements of the Lucent Debt Rescheduling and certain related agreements are sufficiently "unique" or "different" that the Transfer cannot be deemed to meet the "ordinary course of business" test under subpart (B) or the "ordinary business terms" test under subpart (C):

- The option to prepay half the Lucent Note using MFN stock

- Lucent's receipt of registered, fully transferable MFN stock

- Termination of Lucent warranties upon MFN's exercise of the debt for stock option

- Issuance of warrants to purchase MFN stock

- A "material adverse change" provision in the Lucent Note

- A guarantee of the Lucent Note by certain MFN subsidiaries

- Inclusion in the rescheduled debt of MFN's liability on account of the Hilversum Warehouse inventory

After discussion of certain relevant principles of law in point I, below, each of these points of controversy will be considered as they relate to the legal requirements under subparts (B) and (C) of Section 547(c)(2).

<u>Discussion</u>

I.    <u>Governing principles of law</u>

      The Transfer represented a monthly installment payment of antecedent debt made by MFN to Lucent pursuant to the Lucent Debt Rescheduling.  To be exempt from recovery as a preference, a transfer must be "made in the ordinary course of business or financial affairs of the debtor and the transferee" under subpart (B) of Section 547(c)(2).  It might seem counter-intuitive that a restructuring of a company's debt could ever be deemed "in the ordinary course of business" for a corporate entity, even a particularly improvident enterprise.  But restructurings are commonplace in debtor/creditor relationships, particularly in hard times, and are deemed an important and economic means to achieve beneficial results for both debtors and creditors without resort to costly and time-consuming court proceedings.  Moreover, a restructuring of any particular creditor's debt is generally intended to conserve and thereby benefit the debtor's estate and all other creditors.  Accordingly, the courts have recognized that sound policy considerations dictate that restructurings should not be excluded *per se* from the "ordinary course of business" defense to preference avoidance lest a contrary rule serve as a disincentive to any restructurings as an out-of-court means to avoid business failure and bankruptcy.

      The leading decision in this Circuit is *In re Roblin Industries, Inc.*, 78 F.3d 30 (2d Cir. 1996).  Roblin Industries, Inc. ("Roblin") was a manufacturer of specialized steel which relied upon Ford Motor Company ("Ford") for raw scrap metal.  Roblin had accumulated trade debt to Ford and had fallen behind in payments.  Roblin negotiated a repayment plan with Ford for the outstanding balance and terms for new purchases.  Subsequently, Roblin filed a voluntary Chapter 11 petition that

was later converted to Chapter 7.  The Second Circuit, focusing on the requirement in subpart (C) of

Section 547(c)(2), found that the payment to Ford was not exempt from recovery by the Trustee as a

preferential transfer because Ford failed to provide any evidence of industry practice or custom apart

from Roblin's own experience.   In addressing the appropriate standards to apply under

Section 547(c)(2), the court agreed with the reasoning of the Seventh Circuit decision, *In re Tolona*

*Pizza Products Corp.*, 3 F.3d 1029 (7th Cir. 1993) and held that subpart (C) "requires a creditor to

demonstrate that the terms of a payment for which it seeks the protection of the ordinary course of

business exception fall within the bounds of ordinary practice of others similarly situated." *Id*. at 42.

However, in reaching this standard the Second Circuit considered its applicability to restructuring

agreements and reasoned:

> We decline to adopt a rule that payments made pursuant to debt restructuring
> agreements, even when the debt is in default, can never be made according to ordinary
> business terms as a matter of law. That determination is a question of fact that depends
> on the nature of industry practice in each particular case, a factual inquiry that is
> appropriately left to the bankruptcy court.  *See Child World, Inc. v. Service*
> *Merchandise Co., Inc. (In re Child World, Inc.)*, 173 B.R. 473, 478 n. 4 (Bankr.
> S.D.N.Y. 1994); *Sapir v. Keener Lumber Co., Inc. (In re Ajayem Lumber Corp.)*,
> 143 B.R. 347, 353 (Bankr. S.D.N.Y. 1992).  It is not difficult to imagine
> circumstances where frequent debt rescheduling is ordinary and usual practice within an
> industry, and creditors operating in such an environment should have the same
> opportunity to assert the ordinary course of business exception.  *See, e.g.*, *U.S.A. Inns*,
> 9 F.3d at 685 (regular practice in savings and loan industry to adopt payment plans for
> delinquent customers); *Armstrong v. John Deere Co.* (*In re Gilbertson*), 90 B.R.
> 1006, 1012 (Bankr. D.N.D. 1988) (deferral agreements common in retail farm
> implement sales industry).  Indeed, if the industry practice is to restructure defaulted
> debt, it would make little practical sense to require creditors to comply with any other
> standard in order to meet the requirement of § 547(c)(2)(C).

> To apply properly the § 547(c)(2)(C) standard, "ordinary business terms" must
> include those terms employed by similarly situated debtors and creditors facing the
> same or similar problems.  If the terms in question are ordinary for industry participants
> under financial distress, then that is ordinary for the industry. In this way, a creditor that
> agrees to restructure a debt in a manner consistent with industry practice in those

circumstances does not lose the benefit of the exception. A creditor taking such steps should not be viewed as taking "unusual action" when it does no more than follow usual industry practice — precisely the kind of behavior the ordinary course of business exception was intended to protect. Restricting a creditor to courses of action typical in untroubled times leaves no room for realistic debt workouts and unfairly penalizes those creditors that take conventional steps to institute a repayment plan. *See U.S.A. Inns*, 9 F.3d at 682-86; *but see Meridith Hoffman Partners*, 12 F.3d at 1553-54.

*Id.* at 41-42.

To the same effect, *see Arrow Electronics, Inc. v. Justus* (*In re Kaypro*), 218 F.3d 1070, 1073 (9th Cir. 2000) ("We agree with the BAP that the bankruptcy court erred in holding that payments made pursuant to a restructuring agreement are *per se* outside the ordinary course of business category.  The better rule, as the BAP stated, is that 'such determination is a question of fact that depends on the nature of industry practice.'" (quoting *In re Kaypro*, 230 B.R. 400, 406 (9th Cir. BAP 1999)).

While *In re Roblin* ruled specifically on subpart (C), the parties agree that its application informs the analysis under subpart (B) as well.  *See, In re Ice Cream Liquidation, Inc.*, 320 B.R. 242, 251 fn. 14 (Bankr. D.Conn. 2005) (in dicta the court recognized that "[n]evertheless, a fair extension of *Roblin Industries* is that the fact that payments were made on a defaulted debt pursuant to a restructuring agreement is not *per se* disqualifying for Section 547(c)(2)(B) purposes."). If restructuring agreements can be viewed as ordinary business terms within an industry under *In re Roblin*, it is only logical that they may be deemed ordinary course of business in dealings between individual parties, even in the case of a first-time restructuring transaction.  Indeed, application of the *Roblin* policy rationale to subpart (B) is a necessary corollary to its application under subpart (C), since a restructuring is more than likely to be a one-time event for any debtor.  Courts have recognized that first-time transactions can be protected by the ordinary course of business defense.  *See, e.g., In re*

*Finn*, 909 F.2d 903, 908 (6th Cir. 1990) (first time transaction is no less eligible to qualify for ordinary

course of business exception than a transaction that has occurred often in the past); *In re US Office*

*Products*, 315 B.R. 37, 40 (Bankr. D.Del. 2004); *Kleven v. Household Bank F.S.B.*, 334 F.3d 638,

642-643 (7th Cir. 2003) (first-time transaction pursuant to terms of parties' agreement protected under

section 547(c)(2) defense); *In re South Airlines*, 247 B.R. 165, 172-75 (Bankr. D.S.C. 2000).

Having overcome the threshold hurdle by concluding that a restructuring agreement is

not *per se* disqualified from "ordinary course of business" treatment, the question then is, by what test

does one determine whether the transfer was "made in the ordinary course of business" under

subpart (B). Stated differently, ordinary course of business compared to what?

The Debtors have argued that the test for ordinary course of business treatment under

subpart (B) is whether the Lucent Debt Rescheduling was sufficiently similar to the other restructurings

in the global MFN Restructuring that it may fairly be said to have been with the ordinary course of

MFN's business to enter into the Lucent Debt Rescheduling. As formulated by the Debtors, this test

examines the similarities and dissimilarities between the Lucent restructuring and MFN's restructurings

with other creditors similarly situated.

The problem with this analysis is that it conflicts with what the statute says. The statute

commands only that we examine "the ordinary course of business or financial affairs *of the debtor and*

*the transferee*" (emphasis supplied). That is not to say that it would necessarily be inappropriate for

the Court to take cognizance of the terms of other vendor agreements in the MFN Restructuring in

applying the "ordinary course of business" analysis under subpart (B).    *See*, *In re Energy Co-op.,*

*Inc.*, 103 B.R. 171, 176 (N.D. Ill. 1986) ("The Court need not, however, rely solely upon the previous

transactions between the parties, but also may look to similar transactions between either of the parties

and third persons in determining whether the transfer was 'ordinary'") (citations omitted).    But the statute itself looks only to the ordinary course of business between the debtor and the transferee and does not mandate a comparison between the debtor and other creditors.

Subpart (C) of Section 547(c)(2), "made according to ordinary business terms," looks not to the specifics of the transaction between the debtor and the particular creditor, but rather focuses on general practices in the industry, in particular the industry of the creditor.    Failure to establish the industry custom and practice under subpart (C) may doom the creditor's defense under Section 547(c)(2), as it did in *Roblin*.    In the context of this case, subpart (C) requires the Court to determine whether the terms of the Lucent Debt Rescheduling may fairly be said to be within the scope of "ordinary business terms" accepted generally by creditors, in particular vendor creditors, in the telecommunications industry.    *See In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993) ("'[O]rdinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage . . ."); *Matter of Midway Airlines, Inc.*, 69 F.3d 792, 799 (7th Cir. 1995) ("section 547(c)(2)(C) requires objective proof that the disputed payments were 'ordinary' in relation to the prevailing standards in the creditor's industry"); *Advo-System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1048 (4th Cir. 1994) ( "In other words, the benchmark for ordinariness is the norm in the creditor's industry").

Courts have recognized that all cases are going to entail differences in debtor/ creditor relationships and terms, and therefore obviously there are going to be differences amongst restructurings from one case to another.    *See In re Roblin Industries, Inc.*, 78 F.3d at 40 ("Under this standard, a creditor must show that the business terms of the transaction in question were 'within the outer limits of normal industry practices,' *id.*, in order to satisfy the third element of § 547(c)(2).    The conduct of the

debtor and creditor are considered objectively in light of industry practice" (quoting *In re Tolona Pizza Products Corp.*, 3 F.3d at 1033)); *In re Roblin,* 78 F.3d at 42 ("Restricting a creditor to courses of action typical in untroubled times leaves no room for realistic debt workouts and unfairly penalizes those creditors that take conventional steps to institute a repayment plan" (citations omitted)); *In re Tolona Pizza Products Corp.*, 3 F.3d at 1033 ("We conclude that 'ordinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C. *In re SPW Corp.*, 96 B.R. 676, 681-82 (Bankr. N.D. Tex. 1989); *In re White*, 64 B.R. 843, 850 (Bankr. E.D. Tenn. 1986); *In re Economy Milling Co.*, 37 B.R. 914, 922 (D.S.C. 1983)"); *In re Gulf City Seafoods, Inc.*, 296 F.3d 363, 369 (5th Cir. 2002) ("Because 'ordinary business terms' sets an outer boundary to the parties' practices, the ultimate question is simply whether a particular arrangement is so out of line with what others do that it fails to be 'according to ordinary business terms.' We leave this case by case determination where it belongs — with the bankruptcy judge. We only say that the judge must satisfy himself or herself that there exists some basis in the practices of the industry to authenticate the credit arrangement at issue."); *Id.* at 368-69 ("We are in general agreement with the view expressed by Judge Posner, particularly that the statutory language should not be construed to place businessmen in a straightjacket. In any event, we will follow all the other circuits and adopt an 'objective' test for deciding whether a payment arrangement was made 'according to ordinary business terms'; that is, the question must be resolved by consideration of the practices in the industry — not by the parties' dealings with each other."); *In re Jan Weilert RV, Inc.*, 315 F.3d 1192, 1198 (9th Cir. 2003) (footnote omitted), *opinion amended*, 326 F.3d 1028 (9th Cir. 2003) ("in applying § 547(c)(2)(C)

'the court must look to those terms employed by similarly situated debtors and creditors facing the

same or similar problems,' creditors are not required to prove a particular uniform set of business

terms, rather, 'ordinary business terms' refers to the *broad range* of terms that encompasses the

practices employed by those debtors and creditors, including terms that are ordinary for those under

financial distress" (citing *In re Kaypro*, 218 F.3d at 1074 and *In re Tolona Pizza*, 3 F.3d at 1033)).

      In this case the Debtors have identified certain specific aspects of the Lucent Debt

Rescheduling and related transactions which are claimed to be either not "in the ordinary course of

business" within the meaning of subpart (B) or not "made according to ordinary business terms" within

the meaning of subpart (C). Of course, a threshold point of inquiry is whether any of the enumerated

terms of the Lucent Debt Rescheduling was, in fact, "unique" or "different" from other MFN

restructurings or the terms ordinarily agreed upon in restructurings by telecommunications vendors.

Assuming that any of the enumerated terms of the Lucent Debt Rescheduling can fairly be said to be

either unique or different, the Court must make a determination whether the differences are "material."

Materiality here must be judged under two different but related criteria. One is whether or not the

particular difference or uniqueness is such that it has any material significance, *i.e.*, whether it mattered

in the context of MFN's bankruptcy. The second and related criterion is whether the particular

uniqueness or difference implicates the policy underlying the preference avoidance objective of

Section 547, which is to prevent the debtor from preferring one creditor over other creditors by paying

the preferred creditor 100 cents on the dollar on antecedent debt within ninety days of filing for

bankruptcy, while other creditors receive greatly reduced and delayed reorganization dollars under the

Chapter 11 plan. Closely related to this question is whether the preferred creditor may be said to have

extracted the preferential treatment by the exercise of some exigent leverage or pressure not available

to or exercised by other creditors.  *See*, *In re AppOnline.com, Inc*., 315 B.R. 259, 288 (Bankr.

E.D.N.Y. 2004) ("[T]he principle of equality of distribution could not be maintained if creditors who

received payments in response to extraordinary or unusual collection efforts during the preference

period were allowed to retain those payments").

   With these principles informing the Court's analysis, we turn to the points identified by

the Debtors as grounds for rejecting Lucent's Section 547(c)(2) defense.

## II. <u>Controversial terms of the Lucent Restructuring</u>

   Two preliminary comments will be helpful before addressing the Debtors' contentions.

   First, the term "controversy" has been used here, rather than the word "dispute," in

order to distinguish between legal controversy, on the one hand, and disputed issues of fact requiring a

trial, on the other.  In this case, there are no material facts in dispute requiring a trial.  The parties'

controversy on the points raised by the Debtors relates to the legal significance of facts as to which

there is either no factual dispute or no material consequence to the outcome.

   Second, subpart (B) of Section 547(c)(2) is quite different from subpart (C) and

requires different analysis.  Accordingly, we shall deal with each separately.

### A. <u>Subpart (B) of Section 547(c)(2)</u>

   The Debtors have identified seven elements of the Lucent Debt Rescheduling and

asserted that some or all of them are unique or materially different from the restructuring transactions

between MFN and the other approximately 300 MFN vendor creditors comprising the MFN

Restructuring.  From this premise the Debtors argue in substance that the Lucent Debt Rescheduling

was not "made in the ordinary course of business" of the Debtors within the meaning of subpart (B) of

Section 547(c)(2).  But in arguing that the *Lucent Debt Rescheduling*

was not made in the ordinary course of business, the Debtors ignore two crucial aspects of the statute.

Subsection (c)(2) states that "The trustee may not avoid under this section *a transfer* — (2) to the

extent that *such transfer* was" not made in accordance with subparts (B) and (C).  As enacted by

Congress, the statute requires the Court to focus on the *transfer* which is being challenged as a

preference, not on the "Lucent Restructuring" which is simply a term defined by the parties in this

contested matter to comprehend a number of different though related transactions.

Moreover, the statute in subpart (B) requires us to examine "the ordinary course of

business or financial affairs" as between "the debtor and the transferee," not between the

debtor/transferee as compared or contrasted with the debtor's relationships with other creditors.  That

is not to say that the debtor's comparable or contrasting treatment of other creditors would never be

relevant under subpart (B).  But the focus of the inquiry under the statutory language is on the ordinary

course of business as between the debtor and the transferee.

The granting of a mortgage or other lien or the issuance of a subsidiary guarantee

unique in the relationship of the obligor and its creditor clearly would not be within the ordinary course

of business within the meaning of subpart (B).  On the other hand, in the absence of coercion or other

unusual circumstances evidencing preferential treatment of a creditor, a partial or deferred payment on

an antecedent trade debt generally would not be deemed out of the ordinary course of business, since

payment of trade debts either timely or tardily is usually the norm, not the exception.  Stated differently,

there obviously cannot be a *per se* rule that payments on antecedent debts are not in the ordinary

course of business, because in fact such payments are quite normal.  Consistent with the teaching of

*Roblin*, a transfer consisting of a payment of antecedent debt on a reduced and deferred basis pursuant

to a restructuring agreement should not be deemed out of the ordinary course of business under

subpart (B) even if the formal restructuring has no precedent in the particular debtor-creditor

relationship.

In this case, there are no facts to support a conclusion that the Transfer was not in the

ordinary course of business. There was no coercion involved here by Lucent. It was MFN that sought

and obtained from Lucent an agreement to reduce the debt to Lucent by half and extend the payment of

the remaining half over two years.

Nor is there any basis to suggest that there was any intent on the part of either MFN or

Lucent to prefer Lucent over other MFN creditors with respect to the Transfer. MFN has identified no

aspect in which the rescheduling of the debt owed to Lucent (by reduction in half with payments of the

balance monthly over an extended period of time) was more favorable than the reschedulings of

MFN's debts to its other creditors in connection with the MFN Restructuring.

Of the seven points of controversy identified by the Debtors, only one can be said to

reflect preferential treatment of Lucent over other creditors, namely, the Guarantee in favor of Lucent

executed by certain MFN subsidiaries. Initially, the Debtors' only contention with respect to the

Guarantee matter was that Lucent received a guarantee from numerous MFN subsidiaries which had

not theretofore guaranteed the Debtors' obligations to Lucent.[1]  There was no claim that the Guarantee

was unique in any respect other than that the subsidiaries in question had not previously guaranteed the

debt owed to Lucent. It was not until the hearing on the cross-motions for summary judgment that

counsel for the Debtors first argued orally that Lucent alone among MFN creditors received guarantees

---

[1]      *See* the Debtors' motion and memorandum at paragraph 18 and the initial Sokota Declaration at
paragraph 21.

from six foreign "affiliates"[2] which did not file for bankruptcy (the "Non-Debtor Guarantors [or as

appropriate, Guarantees]"), and the further facts that three of these affiliates were sold post-petition and

portions of the proceeds (the "Sales Proceeds") were used to pay down the Lucent debt in 100 cent

dollars.   The argument was documented to a limited extent in a second Sokota Declaration submitted

after the hearing.[3]

        Before turning to the merits of the Debtors' argument respecting the Non-Debtor

Guarantees, it is important to make clear what is *not* decided here, in light of an assertion made in a

response filed by Lucent, to wit, that the Sales Proceeds paid to Lucent did not constitute property of

the Debtors' estate.  Without deciding the point (which has not been addressed by the parties either

factually or legally), it is a sufficient *caveat* to the limited scope of this ruling to observe generally that a

direct or indirect subsidiary of a corporate debtor is indeed an asset which is property of a debtor's

estate, as are the net proceeds from the sale of such an asset.  Moreover, and again without deciding

the point, if a parent corporation were to prefer a particular creditor over other creditors by causing a

solvent subsidiary to guarantee the parent's debt to the preferred creditor within three months of the

parent's bankruptcy filing to the potential prejudice of other creditors, there might be a basis to argue

that such a guarantee constituted a transfer within the ambit of Section 547(b).  But the Debtors here

make no claim that the October 1, 2001 Guarantee signed by the Non-Debtor Guarantors was a

preferential transfer, nor do they seek to recover as a preference the portions of the Sales Proceeds

that were paid to Lucent post-petition.

_____

[2]      What is meant by "affiliates" is not stated.

[3]      Interestingly, the Debtors do not argue that there were no guarantees given in connection with
any of the other 300-odd restructurings that comprised the MFN Restructuring.  The Non-Debtor
Guarantees are characterized as unique solely by virtue of the fact that these Guarantees were the
only guarantees given by subsidiaries or affiliates which did not ultimately file for bankruptcy.

The only preference alleged in this adversary proceeding was the $782,712 Transfer in March 2002 made within three months of the MFN filing date.  The only issue here is whether the *Transfer* (not the Non-Debtor Guarantees) was "made in the ordinary course of business . . . of the debtor and the transferee" under subpart (B).  Whether or not the Non-Debtor Guarantees constituted a preferential transfer subject to avoidance under Section 547(b) or exemption from avoidance under Section 547(c)(2) is a different issue which is not before the Court and which is not relevant to the $782,712 Transfer in March 2002.

To summarize, the fundamental defect in the Debtors' argument is that they seek to show by the seven points in controversy that a collectivity of transactions which the Debtors have defined as the "Lucent Restructuring" was not "made in the ordinary course of business" within the meaning of subpart (B).  But that analysis conflicts with the statute, which focuses only on the transfer which is alleged to constitute a preference .  The Transfer of $782,712 in March 2002 was "made in the ordinary course of business" of MFN and Lucent, even if the Non-Debtor Guarantees and the other six aspects of the so-called "Lucent Restructuring" were not.

**B.      Subpart (C) of Section 547(c)(2)**

At the risk of repetition, the test under Section 547(c)(2)(C) is again whether a *transfer* was "made according to ordinary business terms."  As outlined above, subpart (C) asks whether the *transfer* was made in accordance with normal industry practice.   There is no dispute that restructuring agreements have been and continue to be commonplace in the telecommunications industry since the late 1990s.   It follows that restructuring agreements are equally familiar to the industry's creditors.   This fact has not been disputed by MFN either at oral argument or in the papers

before me.   Nevertheless, at this time the Court will address additional shortcomings in each of the

seven elements raised by the Debtors.

### 1. MFN's option to prepay using MFN stock

The fact that MFN had the option under the Lucent Note to prepay and cancel half the

indebtedness owed to Lucent by issuing stock was neither out of the ordinary course of business within

even the Debtors' view of subpart (B), nor not according to ordinary business terms within the meaning

of subpart (C) of Section 547(c)(2).  As to subpart (B), applying the Debtors' test of comparison with

other MFN Restructurings, Lucent was one of forty-eight MFN vendors to receive stock for debt as

part of the MFN Restructuring.   With respect to subpart (C), Lucent has shown that Nortel, a

competitor of Lucent, accepted payment in equity as part of debt workouts.  Glas Certification,

Exhibit P, p. 57.

More important, even if the stock-for-debt option had been unique in the MFN

experience and in restructurings generally, this would not disqualify the Transfer pursuant to the Lucent

Debt Rescheduling from exemption from preference avoidance under Section 547(c)(2).  The debt-for-

stock option was agreed to by the parties at the request or demand of MFN, not Lucent, and its

purpose was to conserve cash resources for the benefit of all creditors and the Debtors' estate in

general.  The objective of preference recovery under Section 547 is to recover cash or property

transferred to preferred creditors to the detriment of other creditors and the debtor's estate.  That

objective was fostered, not frustrated, by the stock-for-debt option, which benefitted all creditors

except Lucent.   The issuance of stock would have diluted equity, but it could not prejudice the

Debtors' estate or other creditors.

Thus, even if the stock-for-debt option had been unique, it could not be deemed legally material for preference analysis under subpart (B) or (C).

### 2.    Lucent's receipt of registered, fully transferable MFN stock

The fact that Lucent received registered, fully transferable MFN stock whereas the other forty-seven creditors received unregistered stock which MFN was required to register before it was transferable is immaterial for several separate reasons.  For one thing, there was little if any differential in time between MFN's receipt of registered stock and the effective date of registration of stock received by the forty-seven other creditors who received stock in cancellation of debt.  In any event, the stock received by Lucent and the other creditors was virtually if not completely worthless.

More important, as explained in the preceding point the exchange of debt for stock whether registered and transferable or not simply did not implicate the objective of preference recovery under Section 547.   Even if Lucent had received stock that it could have immediately sold in the market, while other creditors did not, that fact would not have been material for preference analysis purposes because there was no transfer of money or property of the Debtors' estate which diminished the estate or prejudiced other creditors.  Issuance of stock affects only equity by reason of dilution.

### 3.    Termination of Lucent warranties

The Lucent Agreement and Note provided that if MFN exercised its option and made the prepayment with registered, transferable stock, thereby reducing the amount of the Lucent Note by half, MFN's exercise of this option would result in termination of any remaining Lucent warranties on products it had previously sold to MFN.  This termination of Lucent warranties, even if unique to Lucent, was immaterial for purposes of preference analysis.  Aside from the fact that there is no evidence that the termination of Lucent warranties had any economic impact on MFN at all, the

termination itself did not implicate Section 547 because it did not result in a transfer of money or

property to creditor Lucent to the detriment of other creditors within the ninety-day period.  The

termination of warranties was a negotiated component of the stock-for-debt option demanded by MFN

which provided very substantial economic benefits to the MFN estate and all other creditors.

### 4.    Issuance of warrants

Contemporaneous with the Lucent Debt Rescheduling, MFN and Lucent entered into a

separate "Warrant Agreement" under which Lucent was granted warrants to purchase ten million stock

units of Metromedia Fiber Network Inc. stock.  The Warrant Agreement was also immaterial to the

preference analysis.  Granting of these warrants did not cost MFN any cash or property within or

without the 90-day preference period and could not disadvantage the Debtors or any other creditor.  If

Lucent alone or with a few other creditors had their rights under the warrants to pay money to purchase

MFN stock, that would result in a capital infusion to the benefit of the Debtors' estate, and it could

never prejudice other creditors.   Accordingly, the issuance of warrants was not material to the

objective of the preference statute.

The Debtors concede the point except they argue that this factor provides, in the

context of all the differences taken together,  "another indicia of the power" Lucent exercised.  But even

assuming the "power" of Lucent and others to extract these warrants, the purported "power" simply

does not implicate a preferential payment within the meaning of Section 547(b).

### 5.    The MAC Provision

The Lucent Note contained a condition that there be no "material adverse change" in

the MFN "business, properties, assets or financial condition" (the "MAC Provision").  Since the parties

concede that the MAC Provision played no role here, materiality cannot arise under Section

547(c)(2)(B) or (C).


###    6.    Guarantee of the Lucent Note by certain MFN subsidiaries

The Debtors do not contest the fact that it is not unusual for creditors to receive

guarantees in connection with restructurings.   Thus, even if it were necessary or relevant to consider

whether the Non-Debtor Guarantees (as opposed to the Transfer) were "according to ordinary

business terms" in the telecommunications industry, it cannot be said that the Non-Debtor Guarantees

were outside "the outer limits of normal industry practices" or were "so idiosyncratic as to fall outside

that broad range [and be] deemed extraordinary and therefore outside the scope" of subpart (C).  The

Transfer was no more nor less than an agreed installment payment of a halved portion of the Debtors'

antecedent debt obligation to Lucent.  There was nothing novel or out of the ordinary course of

business in respect of the Transfer as part of the Lucent Debt Rescheduling, and there can be no doubt

that the Transfer and the Guarantee were well "within the outer limits of normal industry practices" and

were neither extraordinary nor

idiosyncratic.

It bears repeating that Section 547(c) mandates that the Trustee may not avoid a

transfer "(2) to the extent that *such transfer* was" (B) made in the ordinary course of business and (C)

made according to ordinary business terms.   The statute as written by Congress only requires the

creditor to prove that the *transfer* which is challenged as a preference meet the tests in subparts (B)

and (C).  The defect in the Debtors' argument is that it focuses not on the Transfer but on the Non-

Debtor Guarantees, which are not challenged as a preference.  The fact that the Non-Debtor

Guarantees were unprecedented in the prior relationship between MFN and Lucent is simply not

relevant under Section 547(c)(2).

**7.**    <u>**The Hilversum Warehouse inventory**</u>

The Lucent Agreement stated that "MFN has ordered and will order from Lucent certain goods which are held at the Hilversum Warehouse (the 'Hilversum Inventory'), which have not yet been delivered but which when delivered will create an additional obligation from MFN to Lucent in the amount of the aggregate purchase price for those goods of $8,709,570."

The Hilversum Warehouse inventory was product that MFN had ordered and that Lucent had purchased to fulfill the order.  MFN's liability on account of this inventory became part of the debt evidenced by the Lucent Note and then part of the debt scheduled in bankruptcy.  The Debtors argue that Lucent "put the squeeze" on MFN to give Lucent "sweeter" terms of restructuring as compared to other vendors to prevent Lucent walking away from the deal.

MFN's acknowledgment of its liability for the Hilversum Inventory which it had ordered and which Lucent had purchased for it did not constitute a preference and did not implicate the objectives of Section 547(b).   Lucent's claim against MFN in respect of the Hilversum Inventory was going to be part of Lucent's claim against the Debtors in the bankruptcy whether or not it was included in the Lucent Note as part of the Lucent Debt Rescheduling.  Inclusion of MFN's liability for the Hilversum Inventory in the Lucent Note had nothing to do with a preference or preference analysis — it was a claim resolution within the context of a restructuring.

<u>**Conclusion**</u>

The material facts here are not in dispute.  The Transfer sought to be avoided as a preference was made pursuant to the Lucent Debt Rescheduling under which the debt was to be cut in half and paid over twenty-two months.  Under the Second Circuit decision in *In re Roblin*, a transfer pursuant to a restructuring agreement may be accorded the exemption under Section 547(c)(2) if the

transfer comports with the "according to ordinary business terms" requirement of subpart (C) of

Section 547(c)(2).  As to subpart (C), there can be no doubt that similar debt restructuring

arrangements on the part of vendor creditors in the telecommunications business have been routine from

and after the mid-1990s.  With respect to subpart (B), the Transfer challenged here was simply an

installment payment on half the Lucent antecedent debt on an extended payment schedule and was

therefore clearly within the "ordinary course of business" as between MFN and Lucent.  Neither the

Transfer in March 2002 nor the Lucent Agreement and Note dated October 1, 2001 were the product

of any coercion on the part of Lucent.  The Rescheduling was the result of MFN's demand.  For the

reasons articulated above, those aspects of the transactions between Lucent and MFN which the

Debtors assert are "unique" or "different" from other restructurings in the telecommunications business

are not material in the context of preference analysis or not so extraordinary or idiosyncratic as to fall

outside the broad range of business terms which the case law has defined for subparts (B) and (C) of

Section 547(c)(2).

Counsel for Lucent is directed to submit an order consistent with this decision after

review and consent as to form by Debtors's counsel.


Dated: White Plains, NY
        December 20, 2005


                                              _____/s/ Adlai S. Hardin, Jr._____
                                                        U.S.B.J.